D. Dougherty, Referee.
The plaintiff, T. Mitchell Tyng, attorney-at-law, practicing in the city of New York, an expert business man, methodical and exact when disposed, with a knowledge of bookkeeping, became about July, 1888, the attorney and financial disbursing agent of J. & T. Charlton, engaged in the lumber and sash, door and general planing business, located at Tonawanda in the state of New York. The said J. & T. Charlton were, about the time mentioned, engaged in completing ten new buildings nearly finished, and erecting and completing eleven other houses, all on the same plot of ground in the city of Brooklyn. The Charltons were also furnishing “ trim ” for various buildings in process of erection in different parts of that city. Large sums of money were from time to time sent by the Charltons to their disbursing agent, the plaintiff, and by him deposited in the bank in his own name and not as agent or trustee of the Charltons. The said moneys were to be used in paying for the erection and completion of said buildings, and paying charges and expenses connected with their extensive business as dealers in timber and “ trim.”
The defendant, Samuel R Good, was a carpenter, and had been the foreman of one John G. Porter, who had commenced the erection of the buildings before referred to, but after erecting some ten of them, had financially failed; and by an agreement between the said Porter and the said Charltons, title was conveyed to the Charltons, who proceeded to the completion of the first ten and the erection of the remaining eleven, employing the said Good as superintendent; the said Good being furnished with checks drawn by the said Tyng, the plaintiff, from the money appropriated by the Charltons.
The defendant Good had no knowledge of bookkeeping, but roughly kept an account book of moneys received, on one side, and paid out on the other. He kept no bank account, and had no- *324 acquaintance with bank officers or bank business. He was without money, and without credit except such as he may have acquired while acting as superintendent for the Charltons.
The business intercourse continued between Tyng and Good after the completion of the Charlton buildings. While Good ceased to be superintendent from about December 1, 1888, and ceased to receive four dollars per day, he still remained connected with the business of the Charltons and was employed by them in a variety of ways, mostly under the direction of Tyng, up to the month of May, 1889, though he does not seem to have entirely ended his connection with the Charltons until late in the same year.
On and prior to the 19th day of January, 1889, one Jacob G. Dettmer, of the city of Brooklyn, was the owner in fee of the premises mentioned in the complaint herein, and on that day the said Dettmer contracted in writing under seal to sell the said premises to the defendant in two parcels at the price of $14,900 for one parcel, and $10,950 for the other; said parcels of land to be thereafter conveyed by the said Dettmer to the defendant, to be paid for, at the time of such conveyance, by the defendant’s bonds and mortgages thereon to the amount of the entire purchase price thereof. On the same day the said Dettmer entered into a “building loan agreement,” in writing, under seal, with the defendant; whereby the defendant agreed to erect eighteen houses upon said premises, as specified in said agreement, and the said Dettmer agreed to advance to the defendant, in aid of the construction of said buildings, the sum of $40,700, by instalments, at the times and in the manner specified, of which $21,800 was to be advanced upon the first nine of the said houses, the balance upon the remainder; the said houses being built in two parcels, the first parcel of nine houses to be completed before the second parcel was commenced.
About the month of January, 1889, the said plaintiff and defendant had occasional conversations concerning the proposed purchase by Good of said premises from the said Dettmer and of the proposed erection of buildings on said premises, and of the amount of money necessary to “ start the enterprise ” and complete the building in excess of the “building loan.” At some date in January, not specified in evidence, but agreed on by plaintiff and defendant as the 20th of January, 1889, in the office of the plaintiff, the plaintiff spoke of being about to receive certain moneys and of his willingness to join in said undertaking, and the defendant manifested an equal willingness that the plaintiff should do so. There was no agreement in writing, no written memorandum of agreement; there is not a single word in black and white offered in evidence that expresses such an agreement; the terms of the agreement, as stated by the plaintiff in his testimony in chief, are widely different from those stated by the defendant in his answer to the plaintiff’s complaint and in defendant’s testimony, nevertheless, the parties, plaintiff and defendant, have agreed to the following as the verbal agreement entered into as of January 20, 1889:
*325 (1.) That he, said plaintiff, would advance and pay over to the defendant the sum of $1,000 in cash, to be used by the defendant in the construction of said buildings.
(2.) That he, said plaintiff, would introdnce the said defendant to the officers of some suitable bank in Brooklyn where the defendant might open an account.
(3.) That he, said plaintiff, would further furnish to the defendant, to be deposited and held in and by such bank, in the name and for the account of the said defendant, mortgages to the value of §5,200, by means of which securities the defendant might secure the discounting of his notes by said bank And
(4.) That he, the said plaintiff, would advance to the defendant, from time to time upon demand, such sums of money as might be required by defendant to proceed with the erection and completion of the said premises.
As I will have most to say concerning the first stipulation, I will reserve that until the last. The plaintiff never introduced defendant to the officers of some suitable bank in Brooklyn, nor did he ever offer to do so, nor did he make any effort to do so. He gave defendant a note of introduction to Bichard Ingraham, Esq., a lawyer of Brooklyn who had business relations with the Charltons; but it is not pretended that Mr. Ingraham was a bank officer, and there is nothing to show that plaintiff knew Ingraham except in his capacity as agent for the Charltons. At least such is my interpretation of the words, “ he (Good), is measurably connected with us.” In fact the letter of introduction admits that plaintiff did not know any banks in Brooklyn, for he writes to Mr. Ingraham: “ Perhaps you would introduce him at your bank, as I do not know any of your banks or I would introduce him.” This note of introduction was in no way a compliance with the agreement, and was never presented to Mr. Ingraham, and defendant does not appear to have ever opened a bank account.
The plaintiff failed to comply with the third stipulation. He did not furnish the defendant, to be deposited and held in and by said bank in the name of the defendant, mortgages to the amount of $5,200, by means of which securities the defendant might secure the discounting of his notes by said bank. There is not a particle of evidence that the plaintiff ever had any mortgages of his own. There is evidence that plaintiff had in his custody second mortgages belonging to said Charltons, to the amount of §5,200, but there is not a particle of evidence that the said plaintiff had any authority to assign said mortgages to defendant, nor the slightest proof that plaintiff ever took a single step to do so,
Plaintiff failed to comply with the fourth stipulation, namely, that he would advance to the defendant from time to time, upon demand, such sums of money as might be required by the defendant to proceed with the erection and completion of said premises.
The plaintiff and defendant, in their proposed findings, agree that about the middle of June, 1889, on Monday or Tuesday, the defendant went to the office of plaintiff, and told plaintiff that he pvould have to loan $600 the following Saturday, to pay off the *326 mechanics and laborers that worked upon the buildings mentioned in the complaint. The plaintiff told the defendant that he (plaintiff) was very hard up, but that he would have some money about July, and then he would help him (defendant) right out. The defendant went to the plaintiff’s office again on Monday or Tuesday about the last week of June, and the plaintiff told him that he (defendant), would have to carry him (plaintiff), along until about the 1st of July, and then he (plaintiff) -would have some money. The defendant went to the plaintiff’s office again about the last week in June; the plaintiff was sitting in his office with the door open, and when he Saw the defendant coming up the stairs he, the plaintiff, said, “ I have no time to talk to you today.” Defendant then went away, and never thereafter received any communication or visit from the plaintiff in reference to the premises in question, until this action was about to be commenced. The referee further states that the plaintiff never tendered the $600, or any other sum to the defendant, nor is there any proof that he ever had any such sum; nor did the plaintiff ever make any effort to raise the $500, or any other amount, and in fact he entirely abandoned the enterprise. From the last mentioned interview in plaintiff’s office about the end of June, 1889, the plaintiff never called on defendant, never communicated with him in writing or otherwise, never visited the buildings, knew nothing of their condition except as he learned them once or twice in chance meetings with third parties, and was not heard of until on the 1st of the following November, full four months afterwards, when, learning that the houses were nearly completed, plaintiff addressed a note on that date to defendant, asking that his one-half interest in the enterprise-should be secured or adjusted in some way.
Returning to the first clause of the agreement, namely, that the plaintiff would advance and pay over to defendant the sum of $1,000 in cash, to be used by said defendant in the construction of said buildings, the plaintiff does not pretend that he advanced and paid over to the defendant that sum. His contention is that he was only to advance and pay over about $200 to start the enterprise, and that the remaining $800 was to be furnished to complete the buildings, to “ clean up,” after the building loan “ had been exhausted.” The referee cannot accede to such a construction of the terms of the agreement; it is not in conformity with a reasonable interpretation of the intention of the parties. It is the opinion of the referee that the whole sura of $1,000 was to be advanced and paid over at the beginning of the enterprise, and therefore the plaintiff failed to comply with the first stipulation of the agreement.
The plaintiff testified that four several checks, dated February 1, 1889, for seventy-five dollars, the 6th of February, 1889, for fifty dollars, February 11, 1889, for fifty dollars, and February 20, 1889, for twenty-five dollars, were given for and by reason of said agreement, and he, plaintiff, stated in his testimony that these were all the moneys paid him, defendant, on the contract in question. See plaintiff's testimony, page 9. Plaintiff afterward-," at the close of the testimony, did not claim to have paid on the *327 agreement more than the sum of $156.82. While the plaintiff asserts his right to the clear one-half of the profits of the enterprise, and asserts that he has complied with all its stipulations, the referee has already decided against him on all these points, and will now proceed to discuss the alleged payments, amounting in all to $156.82.
Whatever difficulty there may be in reaching a correct conclusion, whatever doubt may linger in the mind of the referee as to those particular payments, the same is entirely the fault of the plaintiff. As already observed, the agreement was never reduced to writing, a most reasonable thing to be expected when an attorney was a party. Had he, the plaintiff, taken receipts, orders, bills, or any written acknowledgment, specifying that the said several checks were given in compliance with said agreement, had he opened the account in his account book in conformity with said agreement, had he kept the moneys of the Charltons separate and apart, and signed the said checks as trustee or agent, had he kept a bank account of his own private funds and drawn these checks on the same," had he proved to the referee that a portion of the deposits were his own separate property, if he had made a memorandum that could reasonably be regarded as evidence against the defendant, all or some of which at least, as a methodical business man and as an attorney of ability (both of which he really is) and a gentleman by no means indifferent to his own interests (as he surely is not), it might be expected he would do, there would be no difficulty in deciding as to these particular checks. As it is, the referee is compelled, if not to grope in the dark, at least to balance the evidence on both sides, and give his decision where the weight is the heaviest. Both sides agree that the said sums were given by Tyng to G-ood, but G-ood swears that they were not given under the agreement, but that they were, with many others, given to pay claims against the Charltons, or to reimburse him for moneys paid out for them and for services rendered to them.
While G-ood ceased to be the superintendent of the Charltons about December 1, 1888, and ceased to receive the four dollars a day, it is equally clear that G-ood, though engaged in building under the contract with Dettmer, was still rendering services to the Charltons in a variety of ways; keeping clean the Charlton buildings, advertising them for sale, directing the finishing of the carpenter work, going for mill work, taking charge of car loads of lumber and trim shipped to customers in Brooklyn, paying freight charges and hauling charges, getting measurements, serving notices now and then on parties, information from public officers, filing papers in Brooklyn court offices, and other services, most of all these done under direction of Tyng as attorney and agent of the Charltons. These services continued up to the month of May, 1889, and, i'ndeéd, if reliance can be placed on hurried loose receipts in pencil for advertising, there is one as late as November. From December, 1888, which was a week after G-ood ceased to be superintendent, up to March, 1889, Tyng gave as many as seventeen *328 checks to Good, in sums ranging from $700 to $25, all drawn by T. M. Tyng to S. E. Good, and amounting in all to over $2,000. It is not undisputed by plaintiff that thirteen of these checks were given defendant for and on account of Charlton’s business, and drawn on Charlton funds standing in the name of the plaintiff.
How, as to the special checks. The plaintiff, in his evidence in chief, says that the check dated February 1st for $75 was given-in pursuance of the contract.
‘‘It was not given for any disbursement on account of the Charltons.’’ On the contrary, Good distinctly specifies the Charlton disbursements for which this check was given, leaving a balance of $23.54, which Good claims for services. On examination of plaintiff’s account book defendant’s evidence is confirmed, for the said disbursements are there enumerated, and the following is written on the next immediate lino: “ S. E. Good, assumed by T. M. T., $23.54,” written over an erasure. On the' argument the plaintiff withdrew his charge of $75 and reduced it to $23.54. This check for seventy-five dollars was drawn on Charlton funds for Charlton disbursements, and cannot in any sense be regarded as money paid under the agreement.
As to the check dated February 8, 1889, for fifty dollars, plaintiff testifies as follows: “ On February 6th, he (defendant) came to me and asked me for fifty dollars to pay for expense of a permit to open the street and get the water in these buildings, and I gave him fifty dollars on that date by the check which I now produce ” (see page 8 of testimony). The plaintiff with distinctness further testifies the same on page 31. On the other hand, defendant swears that the fifty dollars was given for advertising Charlton houses, and he produces twenty-two receipts in small sums, amounting in all to over fifty dollars, for advertising Charlton houses. Though some of the dates are only to be guessed at, yet they are most all after February 6th. The following are the entries on defendant’s rough account book: On page 44, “Charlton, Feby. 5, rec’d T. M. Tyng, $50 ; on opposite page 45, Feby. -9, advertisement $1.75,” and, in lead pencil, $49.92. On page"40 plaintiff says: “I told Mr. Good for him to keep an account of whatever advertising he did on these Charlton houses, and there were some other items he kept an account of, but I have never had any reckoning about them.” There was no offer to prove that plaintiff ever gave defendant any other check to pay for said advertising. The mind of the referee is not free from doubt, yet, as already said, it is the fault of the plaintiff, and the weight of the testimony is that the fifty dollars was paid for advertising houses. The referee clearly inclines to the belief that the check was given by plaintiff on moneys he had standing in his own name but belonging to the Charltons.
Mr. Tyng testifies on page 9: “I gave him fifty dollars on February 11th to pay his architect on the buildings for the plans by the check now produced.” On cross-examination, pages 31 and 32, “ I can’t state exactly which one was to pay for the permits on opening the street to get the water, and the other was to pay the *329 architect for drawing the plans. These checks or either of them were not given to Mr. Good for the purpose of paying freight charges of the Charltons, nor for any other purpose except what I have stated.” This evidence of plaintiff is strengthened by the account book of Good, which is herewith transcribed:
For 45. S.- R Good, McDonough and Ralph ave.
Feb’y 11. Rec’d T. M. Tyng........................
“ “ Albert Sibley.......................
For 44. Opposite.
Feb’y 11. Water permits..........................
Plans for McDonough....................
W m. Hovey, loaned......................
Matthias & Kingsland....................
Brock.................................
$50 00 50 00
31 61 50 00 3 11 16 00 25 33
Defendant, with equal positiveness, swears that the check given by him on February 11 was to pay Charles 0. Seaman, a teamster, who had hauled late in the fall or early in the winter lumber and trim from two freight cars at Palmer’s dock to Reeve and Whalen’s buildings; that while there had been different sums paid for hauling different loads to the various buildings that the Charltons supplied, yet these two car loads of “ stuff ” had not been paid for; that Seaman had tried a number of times to get the money from Good, who had not got it from Tyng, and finally Good had promised the money to Seaman. Good says he got this check of February 11, fifty dollars, to pay Seaman, but he did not pay the identical money to Seaman, but on April 20 paid Seaman the amount due, forty dollars, and on May 17 returned to Tyng the balance, ten dollars. Good’s account book has the following entries : “ April 20th, Charles O. Seaman, for Charlton, forty dollars.” “May 17th, T. M. Tyng, ten dollars.” Mr. Tyng, the plaintiff, says on page 16, and again on page 40, “He (Good)gave me $10 once when I was in Brooklyn; I merely wanted ten dollars, and he gave it to me out of his pocket, for which he is entitled to credit by any report that may be made.” Mr. Tyng to some extent strengthens the statement of Good. “ I think I told Mr. Good I knew he could pay that forty dollars; I think it was for carting, and that he could charge it to me. Plaintiff did not point out any other check he gave the defendant in payment for this particular hauling of Seaman for two loads of stuff for Reeve and Whalen. Indeed, it may be fairly inferred that on page 283 plaintiff admits that on March 20, 1889, he charged in an account to the Charltons forty dollars, not for freight but hauling.
Defendant’s testimony is corroborated by Mr. Seaman that the forty dollars had been due him for some time, and was finally paid as promised by Good, and Sibley testified that about the time Good commenced operations, he came to him and said he required some money to pay for his plans and the survey and to pa) diggers, and he (Sibley) having confidence in Good, “ I made him advances amounting to $1,020, out of my own funds.” The *330 referee cannot but reiterate that the trouble and anxiety in deciding flows from, the plaintiff’s fault, and on the whole the conclusion of the referee is that this fifty dollars was given by plaintiff to defendant to pay the hauling, and defendant applied the particular money to the uses and purposes connected with the buildings mentioned in the agreement. The referee decides that the said check, fifty dollars, February 11, was drawn on money in the name of the plaintiff, but belonged to the Charltons.
On page 9, plaintiff testifies: “ On the 22d of February the defendant came to me to get twenty-five dollars for some other purpose connected with the building, and I gave him the check I now produce. This was given him in pursuance of the contract." Good, on page 92, testifies: “ I went to Mr. Tyng’s office one day and told him, he wanted me to serve some papers around town,- I went in and said I was hard at work and wanted some money, and he said, ‘ How much do you want?’ I said $25, and he gave me that check;” and on page 98, Good says, “ That $25 was given to me by Mr. Tyng for serving and car fare, and expenses, and running overtime. It took me some time to serve these papers.” In January he served a summons. on Samuel McMillan that he (Good) says Tyng charged $10 for. “I knew Ii had a great time to get it, and was there some dozen times before I could get it. I cannot give the date. You have my sworn statement in your office when I served them; ” and on pages 245, 246, he says in answer to a question that he had been performing services for Tyng prior to the receipt of the $25 check: “ I filed all his papers in Brooklyn, fetched him information from records from time to time, served papers on different parties at different times, and was there nearly every day.” The referee cannot from such contradictory statements say with certainty one way or the other; but, all things considered, concludes that the weight of the testimony is in favor of defendant’s version. The referee does not hesitate to say that this check for $25, like the others, was drawn on moneys in the name of the plaintiff belonging to the Charltons.
Thus far the referee has treated of the four checks which plaintiff says were all the moneys paid him on the contract in question. The plaintiff in his rebutting testimony swears that on February 13, 1889, he gave defendant a check for $40 to pay freight on two car loads for Beeve & Whalen, and on the 16th February, 1889, Mr. Good came to him and brought him a freight bill amounting to $31.92, and “ the balance of that check,'$8.28. Mr. Good asked me to charge up to him on McDonough street and Balph avenue houses.” The referee does not see any specific denial on the part of the defendant as to this $8.28, but this check of $40 was given by plaintiff to defendant for and on account of Charlton business drawn on money standing in plaintiff’s name, but belonging to the Charltons.
It will be observed that the referee in .each instance decides that the checks were drawn on moneys belonging to the Charltons. There was not a particle of evidence offered in the case to show that the plaintiff had any money of his own. When he was *331 applied to by the defendant for money under the agreement, according to his own testimony, he told defendant that when he wanted money, if he would let him (plaintiff) know a day or two in advance, he (plaintiff) would write up for some; “ write to Charlton to send me down more money.”
Edward F. O'Dwyer, for app’lt; Victor J. Dowling, for resp’t.
The referee may have been forced to decide adversely to plaintiff for reasons already assigned, and because the testimony of plaintiff in chief very widely differs from his cross-examination and his rebutting testimony, and because while plaintiff’s testimony for the most part stands alone, the defendant is sustained by other interviews.
The referee is further forced to say that, in his opinion, the plaintiff never attempted to carry the agreement into effect This was shown from the very beginning of the operation, for about the time of the digging of the cellars, when defendant consulted the plaintiff as to the purchase of the beams from the Charltons, the plaintiff told defendant that he, plaintiff, did not want the 'Charltons to know that he was connected with the thing, as he, plaintiff, might have to take an adverse position against the defendant. On the whole the referee is of the opinion that the plaintiff has no cause of action, and he therefore directs judgment to be entered in favor of the defendant, dismissing the complaint herein on the merits, with costs.
Dykman, J.
By an agreement between the parties to this action the plaintiff was to acquire an interest in certain real estate upon the performance of certain things which were conditions precedent to the acquisition of such interest, but he did nothing towards the execution of the agreement.
Now he has brought this action upon the theory that he has the legal right to share in the enterprise to the same extent as if he had fully performed his agreement. The trial was before a referee, who has found both the facts and the law against the defendant and his findings and conclusions are fully justified.
The referee has written a long and exhaustive opinion which fully explains the case, and demonstrates the entire absence of merit in the plaintiff’s action.
The judgment should be affirmed, with costs.
Barnard, P. J., and Pratt, J., concur.